**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| CACTUS WELLHEAD, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 2:24-CV-01010-JRG |
| | § | |
| CAMERON INTERNATIONAL | § | |
| CORPORATION, | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM CLAIM CONSTRUCTION OPINION AND ORDER

In this patent case, Cactus Wellhead, LLC alleges infringement by Cameron International Corporation of claims from U.S. Patent 11,137,109. The patent relates "to lubrication systems for wellhead equipment." '109 Patent at 1:15–17. More specifically, the patent teaches "[a] remote greasing system [that] includes a grease supply skid, remote greasing skid, and a control skid." *Id.* at [57]. Using the control skid, a well operator can position the grease supply skid and remote greasing skid within a defined hazardous zone, but stay outside of the hazardous zone to avoid the more dangerous environment around the wellhead. *Id.*

The parties have three disputes about claim scope. Specifically, the parties dispute the scope of "grease trunk line" and "hazardous zone" in Claim 1 and "manual controls" in Claim 5. Having considered the parties' briefing, along with arguments of counsel at a March 23, 2026 hearing, the Court resolves those disputes as follows.

## I.    BACKGROUND

The '109 Patent relates to lubrication of a frac tree, which is a collection of valves connected to a wellhead. Well operators use the valves to control the fluid flow into and out of the

well. During hydraulic fracturing—a technique that stimulates oil and natural gas wells by inject-ing high-pressure water, sand, and chemicals into the wellbore—the frac tree holds large pressures within the well, and regular lubrication of the valves and manifold helps ensure reliable operation. But due to the hazards involved with wellbore operations, such as the high pressures and poten-tially flammable atmospheres, the area around the frac tree might be too dangerous for wellsite personnel to remain near enough to lubricate an in-use wellhead or frac tree. Lubrication therefore typically requires stopping all well operations. *See generally* '109 Patent at 1:22–42.

To address this drawback, the patent teaches a system and method for lubricating valves of a wellhead or frac manifold during operation. As shown in Figure 1 (below), the system (100) includes a grease supply skid (101), a remote greasing skid (131), and a control skid (161). The wellsite (10) has a wellhead (15) with a frac tree (20) that includes various valves (22, 24, 26) and ports (28). A well operator can introduce a lubricant, like grease, into the valves and ports to lubri-cate and seal the internal components. The wellsite also has a frac manifold (21) that supplies fluid to the frac tree during hydraulic fracturing operations. *See generally* '109 Patent at 3:7–21.



**F**IG.1

In Figure 1, the grease supply skid (101) and remote greasing skid (131) are near the frac tree (20) while the control skid (161) is further away. This allows the operator to stay a safer distance from the frac tree during wellbore operation. More specifically, the control skid is outside a hazardous zone (30) defined at a threshold distance from the frac tree. That threshold distance is based on anticipated conditions around the frac tree, like high pressures or a hazardous atmosphere. *See generally* '109 Patent at 3:22–45.

The parties dispute the scope of three terms. Two of the disputed terms concern Claim 1, which recites:

> 1. A remote greasing system for lubricating a valve of a wellhead or frac manifold comprising:
>
> a grease supply skid, the grease supply skid including a grease reservoir and a grease pump;
>
> a remote greasing skid, the remote greasing skid including:
>
> > a grease manifold, the grease manifold operatively coupled to the grease pump of the grease supply skid by a **grease trunk line**; and
> >
> > a grease supply valve, the grease supply valve operatively coupled to the grease manifold, the grease supply valve having an output port, the output port operatively coupled to a lubrication port of the valve of the wellhead or frac manifold by a grease supply line; and
>
> a control skid, the control skid including an interface, the control skid operatively coupled to the remote greasing skid by a control line, the control skid adapted to control the actuation of the grease supply valve;
>
> wherein the grease supply skid and remote greasing skid are positioned within a threshold distance of the wellhead defining a **hazardous zone**, and wherein the control skid is positioned outside of the **hazardous zone**.

'109 Patent at 7:51–8:6 (disputed terms in bold). The third term implicates Claim 5, which requires

the interface of Claim 1 to include "one or more **manual controls including buttons or dials**."
*Id.* at 8:20–22 (disputed terms in bold).

## II.    LEGAL STANDARDS

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips,* 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the

specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

## III.     THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, neither party addresses the level of ordinary skill in the art. The Court will therefore

address the proper characterization of a skilled artisan only to the extent necessary to resolve the present disputes.

## IV.    THE DISPUTED TERMS

### A.    "grease trunk line" ('109 Patent, Claims 1, 13)

| Cactus's Construction | Cameron's Construction |
|---|---|
| Plain and ordinary meaning | "line for supplying grease from the grease supply skid to the remote greasing skid" |

Claim 1 requires:

> a grease supply skid, the grease supply skid including a grease reservoir and a grease pump; [and]
>
> a remote greasing skid, the remote greasing skid including:
>
> a grease manifold, the grease manifold operatively coupled to the grease pump of the grease supply skid by a **grease trunk line** . . . .

'109 Patent at 7:53–59 (emphasis added). Similarly, Claim 13 requires the steps of:

> providing a grease supply skid, the grease supply skid including a grease reservoir and a grease pump;
>
> . . .
>
> providing a remote greasing skid, the remote greasing skid including:
>
> a grease manifold; and
>
> a grease supply valve, the grease supply valve operatively coupled to the grease manifold, the grease supply valve having an output port;
>
> . . .
>
> operatively coupling the grease manifold to the grease pump of the grease supply skid by a **grease trunk line** . . . .

*Id.* at 8:57–9:4 (emphasis added).

The parties dispute whether the "grease trunk line" must extend between the supply skid and the greasing skid, as Cameron urges, or whether it merely needs to "connect[] the grease manifold and the grease pump, regardless of whether they are located on the same or separate skids." Dkt. No. 48 at 5. According to Cameron, Cactus's interpretation contradicts the claim language, which requires that "the remote greasing skid includ[es] a grease manifold, the grease manifold [of the remote greasing skid] operatively coupled to the grease pump of the grease supply skid by a grease trunk line." Dkt. No. 49 at 9–10 (brackets by Cameron). Cameron stresses the specification's description that:

> Grease pumps 105 [of grease supply skid 101] may output grease into **grease trunk line 107** for supply to remote greasing skid 131 as further discussed below. In some embodiments, grease supply skid 101 may be positioned near to remote greasing skid 131 within wellsite 10 such that the length of **grease trunk line 107** may be minimized. By reducing the length of **grease trunk line 107**, without being bound to theory, the pressure drop along **grease trunk line 107** may be reduced from the amount of pressure drop associated with a grease trunk line that extends outside of hazardous zone 30. Additionally, by using a single, larger **grease trunk line 107**, the total pressure drop may be reduced as compared to a system that includes multiple smaller grease lines.

*Id.* at 9 (quoting '109 Patent at 3:63–4:9; brackets and emphasis by Cameron).

Both parties also focus on Claim 12, which recites "[t]he remote greasing system of claim 1, wherein the grease supply skid and remote greasing skid are on one skid." '109 Patent at 8:54–55. According to Cactus, "[r]equiring that the 'grease trunk line' recited in claim 1 must supply grease from the ***grease supply skid*** to the ***remote greasing skid*** ignores [that] claim 12 expressly allows for the grease pump and grease manifold to be located on the same skid." Dkt. No. 48 at 5. Cameron denies that, suggesting Claim 12 only requires an additional skid on which the grease supply skid and remote greasing skid are placed. Dkt. No. 49 at 10.

The Court agrees with Cactus. Nothing about either Claim 1 or Claim 13 requires that the

grease trunk line supply grease from one skid to the other. Rather, those claims only require the grease supply skid to have a reservoir and a pump, and the remote greasing skid to have a manifold. To be sure, the claims require the manifold and pump to be operably connected with the grease trunk line, with the pump on one skid and the manifold on the other, but the claims don't otherwise limit the line's purpose or location.

Neither party's argument about Claim 12 is particularly persuasive. For one, that claim does not recite a "grease trunk line." Moreover, Claim 12 raises a different issue not directly addressed by the parties—whether the requirement that "the grease supply skid and remote greasing skid are on one skid" requires three different skids (Cameron's construction), or whether a skilled artisan would understand that language to mean something else. The parties don't substantively address that issue, so the Court declines the parties' implicit invitation to resolve it.[1]

Finally, contrary to Cameron's assertion, Cactus's position does not contradict Claim 1's language. That position only requires that the "grease trunk line" connect the manifold and the pump, which are required by both claims. That does not mean, as Cameron contends, Cactus "ignore[s] that the claims expressly recite" (1) that "the grease supply skid includ[es] a grease pump," and (2) "the remote greasing skid includ[es] a grease manifold . . . operatively coupled to the grease pump of the grease supply skid by a grease trunk line." Dkt. No. 49 at 12. Those limitations impose additional requirements, and Cactus recognizes as much. *See* Dkt. No. 50 at 4 (calling "false" Cameron's argument that it "attempts to render required claim elements optional").

---

[1] Given the other language of Claim 1 already requires the end result of Cameron's construction, that construction seems more like an attempt of resolving this issue in Cameron's favor by requiring two separate skids. Perhaps Claim 12 requires two skids, but that was not an issue raised for claim construction, and the Court opts not to decide that for now.

All that a "grease trunk line" requires is that it handles grease and it is a "trunk line," meaning it is a main flow path to the manifold input rather than the smaller lines from the manifold outputs to the various ports and valves. Nothing in the specification suggests a "grease trunk line" must connect two skids. Accordingly, the Court rejects Cameron's position and will give this term a "plain and ordinary meaning" construction.

**B.**      **"hazardous zone" ('109 Patent, Claims 1, 13)**

| Cactus's Construction | Cameron's Construction |
|---|---|
| Plain and ordinary meaning | "area around the wellhead or a frac manifold defined based on anticipated operating conditions, outside of which constitutes a safe distance away from the wellhead during operations" |

Claim 1 requires a grease supply skid and a remote greasing skid "positioned *within a threshold distance of the wellhead defining a hazardous zone*, and wherein the control skid is positioned outside of the hazardous zone." '109 Patent at 8:4–6 (emphasis added). Similarly, Claim 13 recites "positioning the grease supply skid *within a threshold distance of a wellhead or a frac manifold defining a hazardous zone*," "positioning the remote greasing skid *within the hazardous zone*," and "positioning the control skid *outside of the hazardous zone*." *Id.* at 8:59–9:10 (emphasis added). Calling "hazardous zone" and "threshold distance" "ambiguous and susceptible to multiple reasonable interpretations," Cameron says the Court must construe "hazardous zone" or risk leaving it to lay jurors to decide the scope of that term. Dkt. No. 49 at 13. Cameron points to the specification's disclosure that "[t]he threshold distance of [the] hazardous zone 30 may be defined based on anticipated conditions around the frac tree." *Id.* (citing '109 Patent at 3:37–45).

According to Cactus, however, "'hazardous zone' is used [in] accordance with its plain and ordinary meaning, which is clear to those of ordinary skill in the art." Dkt. No. 48 at 6. Cactus calls Cameron's construction "redundant" and "superfluous," and criticizes the construction as

improperly adding the limitation of "outside of which constitutes a safe distance away from the wellhead during operations." Dkt. No. 50 at 5.

Cactus's main concern seems to be whether "a safe distance" in Cameron's construction requires actual and absolute safety. *See* Hr'g Tr., Dkt. No. 61 at 31:22–25 (asserting Cameron has confusingly "defined the hazardous zone by saying it's safe to be outside of it"). Cameron doesn't overtly take that position, nor would a skilled artisan understand anything outside of the "hazardous zone" to be absolutely safe given the dangers inherent in operating a wellsite. Rather, the claims only require that the area outside of the defined "hazardous zone" is deemed relatively safe at the time by the well operator "based on anticipated operating conditions." No doubt conditions change, and sometimes the hazardous zone might have to be redefined. *See, e.g.*, *Hellfighters*, https://www.youtube.com/watch?v=rYwyYdcAv7I (last visited Apr. 9, 2026). With that guidance in mind, the Court construes this phrase as "unsafe area around the wellhead or frac manifold based on anticipated operating conditions."

### C.    "manual controls including buttons or dials" ('109 Patent, Claim 5)

| Cactus's Construction | Cameron's Construction |
|---|---|
| Plain and ordinary meaning | "physical controls, as opposed to digital controls displayed on a graphical user interface, including buttons or dials" |

Claim 5, through its dependency on Claim 1, requires "a control skid with an interface" that "comprises one or more manual controls including buttons or dials." '109 Patent at 8:20–22. The parties dispute whether the "manual controls" can be "digital buttons or dials displayed on, for example, a touchscreen." Dkt. No. 48 at 8. Cactus says the specification "discloses just such an embodiment." *Id.* (citing '109 Patent at 6:4–6, 6:39–44). Cameron stresses the differences between Claim 5 and Claim 6, which also depends from Claim 1 and recites a "touchscreen

interface." '109 Patent at 8:23–27. Cameron also points to the specification's explanation that

> [i]n some embodiments, interface 163 may include one or more manual controls including, for example and without limitation, buttons, dials, or other components. In other embodiments, interface 163 may include one or more digital controls including, for example and without limitation, a touchscreen interface . . . .

'109 Patent at 4:42–47. According to Cameron, "if 'manual controls' truly encompassed both physical and digital [controls], it would be unclear why the patentee deliberately separated embodiments in the specification into those having manual controls and those having digital controls." Dkt. No. 49 at 16 (citing '109 Patent at 4:41–47).

The Court agrees with Cactus. "The specification is the 'single best guide to the meaning of a disputed term[.]'" *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1362 (Fed. Cir. 2016) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Here, Figure 7D (below) distinguishes between "manual" and "pulsed" control of valves. Describing that figure, the patent explains "each grease supply valve 135 of remote greasing skid 131 may be manually operated by, for example and without limitation, the use of user interaction elements 201, which may be, for example and without limitation, buttons." '109 Patent at 6:41–44. That passage strongly suggests "digital" buttons on a touchscreen fall within the scope of "manual controls." *See id.* at 6:4–6 (describing Figure 7D as "an example of a graphical user interface (GUI) 200 for a digital, touchscreen-based embodiment of interface 163").



**F**IG.7D

That the patentee may have, as Cameron puts it, "deliberately separated embodiments in the specification into those having manual controls and those having digital controls" is not sufficient to counter the specification's clear description of manually controlling a digital button on a touchscreen. Accordingly, the Court rejects Cameron's position, gives this term a "plain and ordinary meaning" construction, and holds "manual controls" does not by itself exclude the use of a touchscreen.

## V.    CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "grease trunk line" ('109 Patent, Claims 1, 13) | Plain and ordinary meaning |
| "hazardous zone" ('109 Patent, Claims 1, 13) | "unsafe area around the wellhead or frac manifold based on anticipated operating conditions" |
| "manual controls including buttons or dials" ('109 Patent, Claim 5) | Plain and ordinary meaning |

12 / 13

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**So ORDERED and SIGNED this 27th day of May, 2026.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE